IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL FEDERATION                 *
OF THE BLIND,
200 East Wells Street at Jernigan Place   *
Baltimore, MD 21230,
                                    *
TIMOTHY M.S. COLE, SR.
7400 Hogan Road, Apt. 247           *
Jacksonville, FL 32216,
                                    *
JACK C. STEPHENS,
29026 W. Old Highway 40             *
Duchesne, UT 84021,
                                    *
WILLIAM ASHLOCK
3582 N. Access Road                 *
Englewood, FL 34224,
                                    *
and                                             Case No.  1:20-CV-1160
                                    *
MARYANN MURAD,
407 Browning Drive                  *
Howell, MI 48843,
                                    *
          Plaintiffs,
                                    *
     v.
                                    *
ANDREW SAUL,
*in his official capacity as*        *
Commissioner of Social Security,
6401 Security Blvd.                 *
Baltimore, MD 21235,
                                    *
          Defendant.
                                    *
*     *     *     *     *     *     ooo0ooo     *     *     *     *     *     *

**<u>COMPLAINT</u>**

Plaintiffs the National Federation of the Blind ("NFB"), Timothy Cole, Jack Stephens, William Ashlock, and Maryann Murad, (together, "Plaintiffs") bring this suit against Andrew Saul in his official capacity as the Commissioner of Social Security ("the Commissioner"), and state as follows:

## INTRODUCTION

1.      Plaintiffs bring this action in the midst of a global pandemic to protect the health and safety of individuals living with disabilities who are being put at risk of penury, serious illness, and death by the Social Security Administration's ("SSA's") violation of their civil rights.  SSA refuses to accept electronic signatures ("e-signatures") on documents required to initiate a claim for Social Security Disability Insurance benefits ("SSDI") and/or Supplemental Security Income benefits ("SSI") when an applicant applies with an attorney or other authorized representative. Nor does it accept e-signatures on periodic continuing disability review ("CDR") documents. SSA limits the availability of its online SSI application and denies blind people any access to the online process. SSA's refusal to allow all applicants to use its online process for SSDI and SSI applications and to e-sign their documents denies equal access to people with disabilities who cannot independently fill out or sign hard-copy documents, including those who are blind[1] or have disabilities impacting manual dexterity. With the global pandemic, the "wet-ink" signature policy and limited availability of SSI applications also puts these people at grave risk of Coronavirus

---

[1] Throughout this Complaint, the term "blind" is used in its broadest sense to include all persons who, under federal civil rights laws including Section 504, have a vision-related disability that requires alternative methods to access hard-copy standard print.

Disease 2019 (COVID-19) infection, particularly those who are immunocompromised or at high risk for serious complications. The Commissioner's demand for wet-ink signatures and hard-copy SSI applications and CDRs violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and should be enjoined.

2.      SSA provides an online portal through which adults can apply for SSDI benefits. However, applicants who wish to appoint an authorized representative, including legal counsel, must submit required documents in hard copy, with a wet-ink signature.

3.      Adults can apply online for SSI benefits only if they are applying for SSDI benefits at the same time. Adults who are blind are categorically shut out of the online SSI application.[2]

4.      Blind people, people with manual dexterity impairments, and others whose disabilities affect their ability to physically read and sign a paper document cannot independently fill out or sign documents using pen and paper. Individuals with mobility disabilities, vision disabilities, immunocompromises, and other disabilities that substantially limit their ability to travel to mail facilities also must depend on others to submit their documents or risk their health, and possibly their lives, in order to do so themselves. The wet-ink signature requirement and unavailability of the online SSI application therefore compromise their independence and privacy and may endanger their health and lives.

---

[2] *Disability Benefits*, SSA, https://www.ssa.gov/benefits/disability (last visited May 4, 2010).

5.      While the wet-ink signature policy and exclusions from the online SSI application cause delays for all applicants, the problem is worse for people who, as a result of their disabilities, cannot write in hard copy independently and/or cannot travel to mail facilities. These claimants must wait until assistance becomes available.

6.      In normal times, SSA's inaccessible processes deprive these people of their right to independently and privately participate in government programs, interfere with their statutory right to representation, and delay their access to needed benefits in violation of Section 504. Now, because of the pandemic, it requires them to choose between risking their health and their lives and accessing life-sustaining benefits at a time when other supports are overwhelmed or unavailable.

7.      Requiring people with disabilities to seek assistance from others and to apply for SSDI and SSI or complete CDRs through the mail puts them at grave risk of COVID-19 infection.[3] The infection may be transmitted through the mail or through in-person assistance. This risk is particularly acute for people who are immunocompromised, including people with lupus, rheumatoid arthritis, cancer, or HIV, and for people who are at high risk of serious complications or death, including older adults, those with heart, lung, kidney, or liver disease, diabetes, chronic lung

---

[3] *See Coronavirus Disease 2019 (COVID-19): People with Disabilities*, Centers for Disease Control and Prevention ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited May 4, 2020).

disease (including chronic obstructive pulmonary disease ("COPD")), asthma, or

obesity.[4]

8.      SSA allows e-signatures for other SSA forms, including the application to

apply for SSDI or SSI without a representative. That this option is inexplicably not

extended to applicants applying with counsel violates the rights of people with

disabilities to equally effective communication and an equal opportunity to access

public benefits safely, independently, and privately, as well as interfering with their

legal right to representation.

9.      The failure of SSA to make the SSI online application process available to

all applicants, and its decision to categorically exclude the blind, is similarly

indefensible, especially given that an online process has already been developed.

10.     Plaintiffs seek a declaration that SSA's wet-ink signature policy and

failure to make the online SSI application and CDR forms available to all applicants

violate Section 504 and injunctive relief requiring the Commissioner to (1) immediately

begin accepting e-signatures for all documentation associated with SSDI and SSI claims

and CDRs, and (2) allow all applicants to apply for SSI online.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C.

§ 1331, because Plaintiffs' claims arise under a federal statute, Section 504. In addition,

---

[4] *See Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 4, 2020)

the Court has jurisdiction over Plaintiffs' claims for declaratory relief pursuant to 28

U.S.C. § 2201.

12.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)

because the National Federation of the Blind is incorporated within this District and

because a substantial part of the events, acts, and omissions giving rise to Plaintiffs'

cause of action occurred in this District.

## PARTIES

13.     The NFB, the oldest and largest national organization of blind persons, is

a non-profit corporation duly organized under the laws of the District of Columbia with

its principal place of business in Baltimore, Maryland. It has affiliates and members in

all 50 states, Washington, D.C., and Puerto Rico. The NFB is a membership

organization, and the vast majority of its approximately 50,000 members are blind

persons who are recognized as a protected class under federal laws. The NFB is widely

recognized by the public, Congress, executive agencies of government, and the courts as

a collective and representative voice on behalf of blind Americans and their families.

The purpose of the NFB is to promote the general welfare of the blind by (1) assisting

the blind in their efforts to integrate themselves into society on terms of equality and

(2) removing barriers and changing social attitudes, stereotypes, and mistaken beliefs

that sighted and blind persons hold concerning the limitations created by blindness and

that result in the denial of opportunity to blind persons in virtually every sphere of life.

14.     The NFB and many of its members have long been actively involved in

promoting equal access to programs administered by the SSA and other federal

agencies, and access to print materials in every sphere of American life. Some of these efforts are described in the declaration of NFB President Mark Riccobono attached to Plaintiffs' Motion for a Preliminary Injunction.

15.     Many of the NFB's members depend on SSDI and/or SSI, are in the process of applying for these benefits, or will apply in the future.

16.     The NFB brings this suit on behalf its members.

17.     Timothy M.S. Cole, Sr., is a 54-year-old man with non-Hodgkin mantle cell lymphoma (a cancer of the white blood cells) who lives in Jacksonville, Florida. He intends to apply for SSDI and possibly SSI with the assistance of counsel. As a result of his cancer, the side-effects of his medication, and the back pain caused by a bone marrow biopsy required for diagnosis, Mr. Cole is unable to work. Mr. Cole's medication causes him to be nauseous, vomit, and have diarrhea. Some days, the pain in his back prevents him from getting out of bed. Some days, his leg has swollen so he cannot walk on it. He cannot concentrate, cannot sit at a desk, and cannot walk around an office. He is undergoing immunotherapy that suppresses his immune system and is likely to do so for many months. As a result, he wore a mask in public even before the coronavirus pandemic. Going out of the house or touching mail both pose a risk to his health and possibly to his life. Mr. Cole therefore would sign and submit his paperwork electronically if permitted to do so.

18.     Jack C. Stephens is a 61-year-old man with multiple disabilities who lives by himself in an isolated location near Duchesne, Utah. Mr. Stephens is completely blind in one eye, has blurry vision in the other, has a spinal fusion that limits his ability

to walk or stand, has limited range of motion in one shoulder, and has a cardiac condition that leaves him short of breath. He lives in an isolated location, a mile and a half down from his mailbox, down a dirt road that is dangerous for him to traverse on his ATV due to his limited vision. Mr. Stephens, who is unemployed, is in the process of applying for SSDI and possibly SSI. He sought the assistance of an attorney after having difficulty obtaining assistance from SSA by telephone. He would like to be able to sign his application and related forms electronically, but SSA does not allow him to do so.

19.     Mr. Ashlock is a 60-year-old man currently living in Englewood, Florida. Mr. Ashlock is homeless and lives in his truck. Mr. Ashlock is severely far-sighted and cannot read standard print without magnification. Even with magnification, he cannot read smaller fonts or newspapers. Mr. Ashlock has COPD and high blood pressure and suffers from back, knee, and neck pain as a result of past injuries. He cannot walk across a parking lot without experiencing shortness of breath. He has difficulty bending and lifting and is not able to work for more than two to three hours at a time because of pain. Mr. Ashlock is in the process of applying for SSDI and SSI with the assistance of an attorney. If permitted to, he would prefer to sign and submit his documents electronically, because he cannot read them in hard copy and cannot locate the place for the signature without assistance. Mr. Ashlock is attempting to stay as far away from others as possible because he is at significant risk of complications from COVID-19 due to his COPD, hypertension, and other medical conditions.

20.     Maryann Murad is a 48-year-old woman who is blind and is a member of the NFB. Ms. Murad lives in Howell, Michigan. Ms. Murad has received SSDI benefits

since approximately 1995. SSA has required her to participate in a CDR approximately every three to five years. SSA notified her of a CDR in late January or early February 2020. Ms. Murad had to fill out and submit a hard copy CDR short form. Ms. Murad cannot write with pen and ink because of her blindness and had to ask a friend to fill out the forms and help her sign. Ms. Murad is a proficient screen reader user and would complete, sign, and submit the CDR paperwork online if an online process were available. According to SSA's process, if SSA finds her short form insufficient to demonstrate that her disability has not improved, Ms. Murad will have to complete a CDR long form, in hard copy with a wet-ink signature. She desires to be able to complete her CDRs independently and privately. SSA has told Ms. Murad that she will continue going through CDRs to maintain her SSDI benefits.

21. Defendant Commissioner Saul is the head of SSA, a federal agency. He is sued in his official capacity as the official charged with performing the statutory and regulatory duties of SSA and with supervising SSA and its divisions, agents, employees, and representatives. SSA processes claims for SSDI and SSI and determines the form in which those claims may be submitted.

## STATEMENT OF FACTS

22. Over 100,000 individuals apply for disability benefits from SSA each month, amounting to over 2 million annually.[5] Upon information and belief, most of

---

[5] SSA, Disability Insurance Applications filed via the Internet FY2012-Onward, available at https://www.ssa.gov/open/data/ (last visited May 4, 2020).

these applicants are poor and lack the resources most Americans take for granted, including access to transportation and stable housing.

23.     SSDI provides cash benefits, healthcare, and vocational training to certain disabled workers, their families, and their survivors. In 2020, only people with wages or salary lower than $1,260 a month ($15,120 a year), or $2,110 a month for the blind ($25,320 a year) are eligible for SSDI.

24.     In December 2018, 131,758 people received SSDI benefits because they were blind.[6] On information and belief, thousands of people receiving SSDI benefits have impairments that place them at high risk for COVID-19 infection or serious complications. On information and belief, thousands of people with impairments that compromise their ability to sign documents independently and/or place them at heightened risk of COVID-19 infection or serious complications are in the process of applying for SSDI benefits.

25.     SSI provides cash benefits to low-income people with disabilities. In 2020, only adults earning less than $783 a month ($9,396 a year) with less than $2,000 in assets are eligible for SSI.

---

[6] SSA, No. 13-11826, *Annual Statistical Report on the Social Security Disability Insurance Program, 2018*, Facts & Figures About Social Security, 2018: Number of Recipients, 1974-2017, 45 tbl.12 (2018), https://www.ssa.gov/policy/docs/statcomps/di_asr/2018/di_asr18.pdf. This figure includes only beneficiaries who were themselves blind, including adult children and widow(er)s of disabled workers ("SSA, Number of Recipients, 1974-201").

26.     In December 2017, approximately 82,000 people received SSI benefits because they were blind.[7] On information and belief, thousands of people receiving SSI benefits have impairments that place them at high risk for COVID-19 infection or serious complications. On information and belief, thousands of people with impairments that compromise their ability to sign documents independently and/or place them at heightened risk of COVID-19 infection or serious complications are in the process of applying for SSI benefits.

27.     Disability benefits applicants have a legal right to representation in the application process. Applicants who are represented are more likely to have their claims granted, and granted in a shorter time.

28.     Most recipients of disability benefits, including members of the NFB, depend on SSDI and SSI to meet their basic needs, including food, housing, clothing, and healthcare. Many of them have no other source of income.

29.     The COVID-19 pandemic has caused catastrophic job losses across the United States. According to the most recent seasonally adjusted data from the Department of Labor, nearly 18 million people, or 12.4% of the labor force, received unemployment insurance benefits the week ending April 18, 2020. This is the highest

---

[7] *See* SSA, *Number of Recipients, 1974–2017* (last visited May 4, 2020), https://www.ssa.gov/policy/docs/chartbooks/fast_facts/2018/fast_facts18.html#page24 (8.2 million people receive SSI, and one percent of SSI recipients qualify because of blindness).

level of seasonally adjusted insured unemployment ever recorded.[8] Approximately ten times the number of people currently receive unemployment compared to the same week last year, when the rate was 1.2% of the labor force (1,655,000 beneficiaries).[9] On information and belief, the pandemic has similarly increased the number of people applying for SSI and/or SSDI benefits, including among the NFB's members.

30.     People with disabilities have lost vital support during the COVID-19 pandemic. In order to protect themselves and their caregivers from COVID-19, many are going without the assistance of caregivers they need to manage their daily lives. The need for SSI and SSDI benefits is greater than ever.

31.     The process to apply for SSDI and SSI is complex. It requires claimants to submit detailed information about their medical, work, and earnings history. The eligibility criteria for SSDI and SSI are not easily understood, and legal representation increases the chances of a claim being granted and being granted in a timely fashion, without the applicant having to demand reconsideration or an appeal.[10]

32.     To apply for SSDI and/or SSI, claimants and their representatives are required to sign and submit numerous documents to the Commissioner. These include the application, Disability Report (SSA-3368), Authorization to Disclose Information to

---

[8] Dep't of Labor, News Release, Unemployment Insurance Weekly Claims 1 (Apr. 30, 2020), https://oui.doleta.gov/press/2020/043020.pdf.

[9] Dep't of Labor, News Release, Unemployment Insurance Weekly Claims 1 (Apr. 25, 2019), https://oui.doleta.gov/press/2019/042519.pdf.

[10] *See* Gov't Accountability Office, GAO-18-37, *Social Security Disability: Additional Measures and Evaluation Needed to Enhance Accuracy and Consistency of Hearings Decisions* 24 (2017), https://www.gao.gov/assets/690/688824.pdf.

SSA (SSA-827), and, if the applicant is represented, Claimant's Appointment of a

Representative (SSA-1696) and a fee agreement (which may be on the form Fee

Agreement for Representation Before the Social Security Administration (SSA-1693)).

33.     There are usually three ways for people to apply for disability benefits:

online, by phone, or in person at a local social security office.

34.     Approximately half of adults seeking disability benefits apply online.[11]

35.     Claimants can apply for SSI online only if they are not blind, unmarried,

have never applied for or received SSI before, and are applying for SSDI at the same

time.

36.     SSA offices are currently closed due to the COVID-19 pandemic.[12]

37.     At least some SSA offices are not checking mail every day and are

"quarantining" mail for two days before opening.

38.     Generally, SSA takes about 3 to 5 months to process disability benefits

applications.

39.     SSA permits an applicant who is not represented to submit all of the

necessary SSDI documents online, using an e-signature.

40.     An applicant who applies online is asked to select whether she is

represented. When an applicant using the online portal selects that she is represented,

she cannot submit a signature online. Instead, when the application is submitted, SSA

---

[11] SSA, Disability Insurance Applications filed via the Internet FY2012-Onward, available at https://www.ssa.gov/open/data/ (last visited May 4, 2020).

[12] *Social Security & Coronavirus Disease (COVID-19)*, SSA, https://www.ssa.gov/coronavirus (last visited May 4, 2020).

will print it out and mail it back for the claimant to sign a hard-copy attestation. After signing in ink, the claimant must mail the signed application back to SSA.

41.     The forms to appoint a representative (SSA-1696) and fee agreements cannot be submitted online. They must be printed, signed with a wet-ink signature, and returned to SSA by mail.[13]

42.     Once a person is approved for SSDI or SSI, she is required to continue to sign forms with wet-ink signatures to maintain her benefits. SSA is required to conduct continuing disability reviews (CDRs) every three years to determine whether a recipient's disability has improved. SSA may choose to conduct these reviews every five to seven years if it determines a recipient's condition is unlikely to improve.

43.     A CDR may begin with a paper Disability Update Form (Form SSA-455). If SSA is satisfied, based on the Disability Update Form, that the recipient's medical condition has not improved, SSA may defer the CDR for a period up to seven years. Alternatively, a CDR may begin with a longer paper Continuing Disability Review Report (SSA-44). If SSA is not satisfied with the Disability Update Form, it will require the recipient to complete the long Continuing Disability Review Report. Both forms are

---

[13] SSA, *Program Operations Manual System (POMS)*, GN 03910.040 (May 1, 2020), https://secure.ssa.gov/apps10/poms.nsf/lnx/0203910040 ("A claimant must sign a written notice of appointment. The claimant's signature must be in ink. We *do not* accept signatures generated from electronic software programs (e.g., DocuSign or HelloSign) . . . ." (emphasis in original)); SSA, *Program Operations Manual System*, GN 03940.003 (July 12, 2018), https://secure.ssa.gov/apps10/poms.nsf/lnx/0203940003 ("While we cannot currently accept electronic signatures on fee agreements, we will as they become available through future systems enhancements.").

in paper and require the recipient to complete the form in black ink or #2 pencil, sign in wet ink, and return the form by mail within 30 days.

44.     In a CDR, the beneficiary must also submit a renewed medical release (SSA-827), and potentially a Work Activity Report (SSA-820 for self-employment, SSA-821 for employees). The Work Activity Reports must be filled out in hard copy, signed with a wet-ink signature, and returned to SSA. On information and belief, during a CDR the SSA-827 must be similarly signed in hard copy.

45.     SSA does not use the hard copies of the documents it demands. Once it has received the forms or documents, SSA employees scan them into an electronic system (the Electronic Records Express) and destroy the originals.

46.     By refusing to accept e-signatures, SSA makes independently and privately submitting an application for SSI or SSDI impossible for blind people, including NFB members, if they choose to be represented by counsel. The refusal to accept e-signatures on CDR forms makes it impossible for blind people, such as Ms. Murad and other NFB members, to independently and privately complete the CDR forms, even if they do not have representation.

47.     Blind people require assistance locating the place for a signature when forced to communicate in paper documents. They also need assistance reading the paper documents.

48.     By categorically excluding blind people from the online SSI process, SSA makes it impossible for them to apply for SSI independently and privately, with or without representation.

49.     SSA's online application forms are presumably accessible to blind people using assistive technology, as required under Section 504 and Section 508 of the Rehabilitation Act. In addition, their CDR forms are created electronically and, therefore, are presumably accessible in that format as required by Sections 504 and 508. Because SSA insists that these otherwise-accessible forms be printed and signed with a wet-ink signature, SSA makes them inaccessible to blind people.

50.     By refusing to accept e-signatures, SSA also makes independently submitting an application with counsel for SSDI or SSI or completing a CDR difficult for people with compromised manual dexterity, who cannot hold a pen. The same problems arise for SSI applicants who do not meet the criteria to apply online, for example, those who have received SSI before or are married.

51.     Requiring wet-ink signatures and paper applications imposes additional hardships on blind people and people with other disabilities who are low income, as those eligible for SSDI and SSI overwhelmingly are. These applicants are less likely than others to have ready access to transportation and therefore are less likely to be able to go to the store or post office to purchase needed supplies (stamps, envelopes) or to mail their letters. Their disabilities may make traveling even short distances difficult, painful, or impossible. SSDI and SSI applicants often prefer to communicate with their attorneys remotely for the same reasons. While accessible electronic documents providing for electronic signatures would permit such remote interaction, SSA requires attorneys to mail documents, including representation and fee agreements, to applicants and wait for their return. Accessibility barriers, as well as the risk of infection from coronavirus

in stores, postal facilities, and transportation, also impede these individuals' ability to travel to post offices and attorneys' offices. Blind claimants face barriers ordering products from the Postal Service online, because the Postal Service app is reportedly inaccessible.

52.     The logistical burdens imposed by the wet-ink signature requirement and the paper SSI application are a source of significant hardship and delay to applicants, including Mr. Cole, Mr. Stephens, Mr. Ashlock, and members of the NFB. The paper process can delay a claim for up to a month compared to submitting through an entirely online process.

53.     The paper process also places claimants at the mercy of the mail system. In the first quarter of 2020, the United States Postal Service (USPS) reported that "Single-Piece First-Class Mail['s] . . . national Three-to-Five Day performance was 78.2% on time."[14] The averages alone show that claimants face a significant risk of delay or failure to deliver their applications, but these averages disguise wide variances in the country. Certain regions performed as poorly as 72.2% on-time (Mid-Carolinas), 70.9% on-time (Colorado/Wyoming), and 55.4% on-time (Houston).[15]

54.     For those Plaintiffs who, as a result of their disabilities, need assistance to fill out and sign their documents and/or access the mail, the wet-ink signature requirement and paper SSI application compromises their privacy and independence,

---

[14] USPS, *Quarterly Performance for Single-Piece First-Class Mail* 1 (Quarter 1 FY2020), https://about.usps.com/what/performance/service-performance/fy2020-q1-single-piece-first-class-mail-quarterly-performance.pdf.

[15] *Id.* at 2–3.

as well as potentially imposing additional delay as they await someone to assist them in reading and signing the documents.

55.     In addition to imposing extra burdens and delays, the paper-based system puts people, such as Mr. Cole, with compromised immune systems or other risk factors, at heightened risk of contracting an infection by forcing them to travel outside their homes and by forcing them to interact with the mail, which may carry the COVID-19 virus.

56.     The COVID-19 pandemic has increased the discriminatory effect of the archaic wet-ink signature policy on Plaintiffs and their members.

57.     As of May 4, 2020, stay-at-home orders were still in full effect in 25 states, including Michigan, and the District of Columbia, while in other states, including Florida and Utah, lesser restrictions remain in place. All states are operating under guidelines for preventing the spread of coronaviruses. Public health and government officials consider social distancing critical to prevent the spread of COVID-19.

58.     Plaintiffs who require assistance to fill out and sign paper forms or access the mail cannot both socially distance themselves from others and apply for SSDI or SSI with counsel. They cannot socially distance themselves and complete CDRs or the SSI application, if they do not meet the online criteria. By requiring them to come into close contact with others to assist them in reading, completing and signing the forms, SSA puts Plaintiffs at unnecessary risk of contracting COVID-19.

59.     People who need but cannot access assistance because of COVID-19 cannot apply for SSI or SSDI or complete their CDRs at all.

60.     Requiring Plaintiffs to communicate via paper mail also puts them at an unnecessary risk of coming into contact with the virus, which may survive on paper or cardboard surfaces. Plaintiffs with compromised immune systems are particularly susceptible.

61.     SSA's system also puts others at unnecessary risk of contracting COVID-19 from an applicant with the virus, either by touching contaminated mail or by assisting them to sign the forms. Lawyers, postal service or delivery employees, and SSA employees themselves all handle these paper applications.

62.     SSA has long acknowledged its authority to use e-signatures and its ability to authenticate them. Indeed, it uses them when claimants choose to apply for disability benefits without counsel. It has simply chosen not to implement the practice for claimants who choose to enlist the assistance of a representative.

63.     Similarly, SSA has the authority to allow blind claimants and others to apply for SSI online and has simply chosen to restrict the availability of the online application.

64.     The Government Paperwork Elimination Act ("GPEA") encourages agencies to accept e-signatures and the "electronic maintenance, submission, or disclosure of information." Pub. L. No. 105–277, tit. XVII, § 1704, 112 Stat 2681 (1998).

65.     The Electronic Signatures in Global and National Commerce Act (E-SIGN Act), Pub. L. No. 106–229, 114 Stat. 464 (2000) (codified at 15 U.S.C. §§ 7001–7031), establishes a general rule that electronic signatures are valid in transactions affecting interstate commerce. The E-SIGN Act states that it does not "require any person to

agree to use or accept electronic records or electronic signatures, *other than* a governmental agency with respect to a record other than a contract to which it is a party" — i.e., the Act requires governmental agencies to accept electronic signatures on records other than the agency's contracts. 15 U.S.C. § 7001(b)(2) (emphasis added).

66.     In 2002, SSA published a Notice in the Federal Register acknowledging that the GPEA encouraged agencies to use e-signatures; that it had the authority to approve the use of e-signatures; and that e-signatures submitted through an approved process are as authentic as wet-ink signatures.[16]

67.     In 2004, the SSA Office of the Inspector General published a report on other agencies' success using e-signatures and encouraged SSA to study their practices.[17]

68.     In 2012, SSA began allowing people without representatives to electronically sign and submit Form SSA-827, Authorization to Disclose Information to the Social Security Administration. SSA estimates that allowing online submission of this one document, alone, allows them to process claims nine days faster.[18]

---

[16] *Use of Digital or Other Electronic Signature Technologies*, 67 Fed. Reg. 55906 (Aug. 30, 2002).

[17] Office of Inspector General, SSA, A-04-04-24004, *Current Practices in Electronic Records Authentication* 10 (2004), https://ssaoigstg.prod.acquia-sites.com/sites/default/files/audit/full/pdf/A-04-04-24004.pdf.

[18] *Medical/Professional Relations: Alternative Signature Processes for Form SSA-827 -- "Authorization to Disclose Information to the Social Security Administration (SSA)"*, SSA, https://www.ssa.gov/disability/professionals/eAuthorization.htm (last visited May 4, 2020).

69.     In 2018, Congress passed the 21st Century Integrated Digital Experience Act (21st Century IDEA), which requires, among other things, that "[n]ot later than 180 days after the date of the enactment of this Act, the head of each executive agency shall submit to the Director and the appropriate congressional committees a plan to accelerate the use of electronic signatures standards established under the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7001 et seq.)." Pub. L. No. 115-336, § 5, 132 Stat. 5025, 5027 (2018). The 21 Century IDEA also requires "[t]he head of each executive agency [to] regularly review public-facing applications and services to ensure that those applications and services are, to the greatest extent practicable, made available to the public in a digital format." *Id.* § 4(b), 132 Stat. at 5027.

70.     The following year, SSA issued the report required by that Act. That report identified the "Online Disability application" as "high-traffic and/or important for public engagement" but failed to address the issue of electronic signatures for claimants applying with counsel. The report itself is electronically signed. The report does not mention opening the online SSI process to more, or all, claimants.[19]

71.     Starting in June 2020, SSA will allow individuals to submit electronic signatures on the SSA-89, Authorization for the Social Security Administration (SSA) To Release Social Security Number (SSN) Verification.

---

[19] SSA, *Public Law 115-336, "21st Century Integrated Digital Experience Act" December 2019 Report* (2019), https://www.ssa.gov/digitalstrategy/documents/ Website_Modernization_Report_for_Congress_21st_Century_IDEA.pdf.

72.     In October 2018 and April 2020, SSA published detailed guides for how to use e-signatures but did not expand the capability to those applying to SSI or SSDI with counsel.[20]

73.     On March 22, 2020, the Office of Management and Budget (OMB) issued a memorandum to the heads of executive departments and agencies urging them to use e-signatures and digital processes "to the fullest extent practicable" during the COVID-19 pandemic.[21]

74.     SSA has also long been aware of and chosen to disregard the burden on disabled applicants caused by conditioning their use of counsel on wet-ink signatures.

75.     On March 23, 2011, an advocate wrote to SSA to protest that requiring wet-ink signatures was a burden to his clients who were too ill, injured, or in pain to travel to his office and that using the mail to process and finalize applications caused delays. On June 1, 2011, SSA threatened him with sanctions for submitting applications with electronic signatures.

76.     Mr. Stephens desires to both use the services of an attorney and submit his application for disability benefits electronically, because he was unable to apply by telephone. Because SSA does not permit him to do so, he has been forced to wait for

---

[20] SSA, *Data Exchange – Internal Components Applying a Digital Signature to a PDF* (2020), https://www.ssa.gov/dataexchange/documents/Applying%20a%20 Digital%20Signature_Internal%20Partner.pdf; SSA, *Data Exchange – External Partners Applying a Digital Signature to a PDF* (2020), https://www.ssa.gov/dataexchange/ documents/Applying%20Digital%20Signature_External%20Partners.pdf.

[21] Margaret M. Weichert, OMB, M-20-19, *Harnessing Technology to Support Mission Continuity* (Mar. 22, 2020), https://www.whitehouse.gov/wp-content/uploads/ 2020/03/M-20-19.pdf.

paper forms to be mailed from his attorney's office to his home, then to sign them and return them by mail. This has delayed his application and caused him significant inconvenience.

77.     Mr. Cole intends to apply for SSDI, and possibly SSI, and intends to retain an attorney to assist him with that application. If SSA allowed e-signed applications and forms, Mr. Cole's attorney could work with him to prepare an application and the relevant forms, then email them to Mr. Cole for him to review and sign on his smartphone. Because Mr. Cole does not have a computer or printer at his home, his attorney cannot email him the application and forms for Mr. Cole to print himself. Instead, under SSA's current procedures, the attorney will have to mail the paper forms to Mr. Cole for Mr. Cole to sign and mail back. Because he is immunocompromised, touching mail or going out of the house threatens his health, and possibly his life. In addition to the health risks, the delays that are likely to be caused by the mail threaten to prevent Mr. Cole from receiving his full back pay, as he has been unable to work since May 28, 2019, and back pay can go back only one year.

78.     Mr. Ashlock intends to apply for SSDI and SSI with the assistance of an attorney. He would prefer to review the necessary documents on his phone, where he can magnify the text to be able to read it and sign electronically. He will not be able to review and sign the documents to apply independently, which will compromise his privacy and independence. His COPD places him at risk of severe complications from COVID-19, and he will be at greater risk of contracting the virus if he must use the mail.

79.     Ms. Murad desires to fill out her CDR forms independently and privately. In February 2020, she was told by an SSA representative that the forms were not available in electronic form. Ms. Murad attempted to schedule a phone meeting with an SSA representative to fill out the CDR Disability Update Form in February 2020, but the SSA representative stated he could not complete the form for her by phone. SSA scheduled an in-person meeting with her on a day she told them she was unavailable, in a location 45 minutes from her home. As a result of her disability, Ms. Murad cannot drive and does not have ready access to transportation, so she cancelled the meeting. Ms. Murad was forced to rely on a friend to fill out the forms necessary for the CDR. This compromised her independence and her privacy. If SSA finds Ms. Murad's Disability Update Form form insufficient, she will be required to fill out the longer Continuing Disability Review Report, also in hard copy with a wet-ink signature and will, again, require assistance to do so.

80.     SSA refuses to implement a process for electronic signatures for people with disabilities who require the life-saving benefits provided by SSDI and SSI and who wish to apply with a representative. It has also refused to allow beneficiaries to complete and submit the forms necessary for a CDR online. It has excluded blind people from the online SSI process entirely and made it inaccessible to people with other disabilities who do not meet the online application criteria. Its unwillingness to make the SSDI and SSI processes fully accessible, in the middle of an unprecedented public health crisis when access is desperately needed, and when it has ready means to do so, is indefensible and discriminatory.

## COUNT I

### VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973

81.     Plaintiffs incorporate by reference the allegations set forth above.

82.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any . . . program or activity conducted by any Executive agency.

83.     The NFB is a membership organization that represents people who are blind. The NFB's blind members are "individual[s] with a disability" as defined in 29 U.S.C. § 705(20) (which refers to 42 U.S.C. § 12102 for Section 504) because blindness is "a physical . . . impairment that substantially limits one or more major life activities," including seeing.

84.     Some blind members of the NFB, including Ms. Murad, qualify for SSA disability benefits.

85.     Blind members of the NFB who receive SSI and/or SSDI benefits must complete CDRs periodically.

86.     Jack Stephens is a blind individual who likely qualifies for SSA disability benefits. Mr. Stephens wishes to both utilize an attorney to assist with his application for disability benefits and to apply electronically, using an e-signature to verify his application.

87. Mr. Cole is an individual with non-Hodgkin mantle cell lymphoma. His immune system is severely compromised as a result of his treatment. He likely qualifies for SSDI. He intends to apply for SSDI with an attorney and wishes to use a fully online process, including an e-signature, to complete his application.

88. Mr. Ashlock is a blind individual with COPD and other disabilities who likely qualifies for SSDI and SSI. Mr. Ashlock intends to apply for disability benefits with the help of an attorney and wishes to use a fully online process, including an e-signature, to complete his application.

89. Maryann Murad is a blind individual who has received SSDI benefits since approximately 1995. She has been required to complete paperwork for a CDR approximately every three-to-five years since she began receiving SSDI benefits and will continue to be required to do so going forward. She wishes to be able to complete and submit this paperwork privately and independently.

90. Members of the NFB and the individual Plaintiffs are thus individuals with disabilities.

91. SSA is a federal executive agency required to comply with Section 504.

92. SSA is bound by regulations the Department of Health and Human Services has promulgated under Section 504 of the Rehabilitation Act, 45 C.F.R. pt. 85.

93. SSA may not, "in providing any aid, benefit, or service . . . [d]eny a qualified individual with handicaps the opportunity to participate in or benefit from the aid, benefit, or service," "[a]fford a qualified individual with handicaps an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that

26

afforded others," or "[o]therwise limit a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 45 C.F.R. § 85.21(b)(1)(i)–(ii), (b)(1)(vi).

94.     Nor may SSA "utilize criteria or methods of administration the purpose or effect of which would [s]ubject qualified individuals with handicaps to discrimination on the basis of handicap; or [d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with handicaps." 45 C.F.R. § 85.21(b)(3).

95.     The Section 504 regulations also require SSA to "take appropriate steps to ensure effective communication with applicants [and] participants" and "furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate" in its programs. *Id.* § 85.51. SSA must "give primary consideration to the requests of the individual with handicaps" in determining the type of auxiliary aid to provide. *Id.* "[A]uxiliary aids" are "services or devices that enable persons with impaired sensory, manual, or speaking skills to have an equal opportunity to participate in, and enjoy the benefits of, programs or activities" that SSA conducts. *Id.* § 85.3.

96.     As alleged herein, SSA has and continues to discriminate unlawfully against disability benefits applicants by excluding them from using SSA's online application system and depriving them of equally effective communication with SSA.

97.     Plaintiffs cannot communicate with the SSA on equally effective terms as others because they cannot file for SSI or SSDI benefits with the assistance of a representative without help and/or without increased risk to their health and lives.

98.     SSA's unreasonable maintenance of the wet-ink signature policy has further limited applicants' access to disability benefits during the COVID-19 epidemic, which has made paper communication and in-person assistance unsafe and scarce. Requiring applicants to file with wet-ink signatures compromises their privacy and independence.

99.     Plaintiffs cannot communicate with the SSA on equally effective terms as others because, with the exception of Mr. Cole (who is not blind), they cannot apply for SSI online at all. SSA's exclusion of the blind from the online SSI application has made communication even less effective in the context of the COVID-19 epidemic, which has made paper communication and in-person assistance unsafe and scarce. Requiring Plaintiffs to file for SSI on paper compromises their privacy and independence.

100.    As alleged herein, SSA has and continues to discriminate unlawfully against Plaintiffs and their members by denying them an equal opportunity and limiting their ability to apply for SSI and SSDI benefits. Because of their disabilities, the application process is more cumbersome to Plaintiffs than to others. They do not have the same ability to apply to SSI and SSDI independently, privately, without risking their health, and with the assistance of a representative. During the COVID-19 pandemic, their inability to access in-person help to sign documents has further limited their opportunities to apply for SSDI and SSI benefits.

101.    As alleged herein, SSA has and continues to discriminate unlawfully against Plaintiffs and their members by using methods of administration—requiring wet-ink signatures and paper applications—that have the effect of discriminating against Plaintiffs because, as a result of their disabilities, they cannot fill out or sign documents privately, independently, and/or safely.

102.    SSA's policy of requiring wet-ink signatures for certain SSDI and SSI applications and related forms is not necessary. Commercial e-signature systems are widely available that meet the requirements of federal law, as well as SSA and OMB guidelines. SSA already allows e-signatures for some purposes, and expanding their availability is in keeping with federal guidelines.

103.    Adopting an online SSI application for all claimants is a reasonable accommodation or auxiliary service and the one Plaintiffs prefer. SSA already allows some applicants to apply for SSI online, and expanding the availability of the online application is in keeping with federal guidelines.

104.    The Commissioner's conduct has harmed the individual Plaintiffs and harmed the NFB's members by saddling them with unnecessary burdens and delays when applying for SSDI and/or SSI benefits or completing CDRs, compromising their privacy, and putting them at risk of illness or death.

105.    The Commissioner's conduct constitutes an ongoing and continuous violation of the law. Unless restrained from doing so, the Commissioner will continue to so violate the law. The Commissioner's conduct has caused and will continue to cause Plaintiffs immediate and irreparable injury. Plaintiffs have no adequate remedy at

law for the injuries they suffer and will continue to suffer. Thus, Plaintiffs are entitled to injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Declare that the Commissioner's policy requiring wet-ink signatures on forms required to apply for SSDI and/or SSI benefits with an authorized representative, and requiring wet-ink signatures on CDR forms, violates Section 504 of the Rehabilitation Act of 1973.

B. Declare that the Commissioner's policy categorically excluding the blind from the online SSI application violates Section 504 of the Rehabilitation Act of 1973.

C. Grant a preliminary and permanent injunction requiring the Commissioner to: (1) immediately accept electronic signatures using commercially available technologies that are compliant with the E-Sign Act for all documentation required to initiate a claim for SSDI and/or SSI benefits and appoint a representative where an online application is available; (2) allow claimants to submit all documents to complete a CDR electronically and accept electronic signatures using commercially available technologies that are compliant with the E-Sign Act for all such documentation; and (3) allow all claimants to apply for SSI online with electronic signatures, using commercially available technologies that are compliant with the E-Sign Act .

D. Award Plaintiffs reasonable attorneys' fees and costs, as provided by law; and

E.      Order such other and further relief as the Court deems just and proper.

Respectfully submitted,

Eve L. Hill (D.C. Bar No. 424896)
Andrew D. Freeman (*pro hac vice pending*)
Abigail A. Graber (D.D.C. Bar No. MD109)
Brown, Goldstein & Levy LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Telephone:  (410) 962-1030
Facsimile:  (410) 385-0869

Counsel for Plaintiffs